# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| **CLAYTON TURNER,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | Civil Action Number |
| ) | **5:17-cv-2092-AKK-GMB** |
| **OFFICER SABIN TRONCONE, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

Clayton Turner filed this 42 U.S.C. § 1983 action alleging that Terry Lucas and Sabin Troncone, officers with the Huntsville Police Department, lacked probable cause or consent to search his vehicle on April 4, 2017, and therefore violated his Fourth Amendment right against unreasonable search and seizure. Doc. 7 at 3. The magistrate judge filed a report recommending this action be stayed pending the outcome of Turner's state court criminal proceedings in *State of Alabama v. Clayton Allen Turner*, CC-2017-3929. Doc. 29. The parties were afforded 14 days to file objections. *Id*. Turner filed a motion for discovery, doc. 30, the same day as the magistrate judge's report, and the Defendants timely objected to the report and recommendation, doc. 31.

## I. Procedural History Post-Dating the Time Allotted for Objections to the Report and Recommendation

Subsequent to the magistrate judge's report, Turner pleaded guilty to Possession of a Controlled Substance in the Circuit Court of Madison County, Alabama, receiving a sentence of time served. *See* www.alacourt.com, *State of Alabama v. Clayton Allen Turner*, CC-2017-3929, doc. 69.[1] Pursuant to the plea agreement, Turner's remaining charges were nolle prossed. *Id.* In light of Turner's plea, the Defendants filed a supplement to their special report and motion for summary judgment notifying the court of the plea agreement and arguing Turner's conviction barred the § 1983 claims from proceeding further under *Heck v. Humphrey*, 512 U.S. 477 (1994). Doc. 32.

Turner filed a reply and attached his *pro se* Motion to Withdraw Plea of Guilty on grounds of ineffective assistance of trial counsel. Doc. 33 at 4-9. Subsequently, however, Turner, through newly appointed counsel, filed a "Withdraw[al] of Previously Requested Plea Withdrawal," doc. 88, rendering his "Motion to Withdraw Plea of Guilty" moot, *id.*; doc. 90. Turner has launched no further direct or collateral attacks on his conviction. In other words, his guilty plea in Madison County still stands.

---

[1] This court may take judicial notice of Turner's state court criminal proceedings. *See Keith v. DeKalb Cnty., Georgia*, 749 F.3d 1034, 1041 n.18 (11th Cir. 2014) (taking judicial notice of DeKalb County Superior Court Online Judicial System pursuant to Fed. R. Evid. 201).

## II.     Summary Judgment Facts[2]

Late one evening, Turner gave a friend a ride to the Hunter's Ridge Apartment Complex in Huntsville, Alabama, and parked on the road in front of his friend's building. Doc. 7 at 5; Troncone bodycam at 23:02:42. Troncone, "a member of the Huntsville Police Department Anti-Crime Team which focuses on high crimes areas," was patrolling the complex and noticed Turner's vehicle "parked in the roadway in a no parking zone." Doc. 7 at 5; Doc. 22-1 at 2-3. Troncone saw "a black male" exit the vehicle as he "initially drove past" and turned his patrol car around. Doc. 22-1 at 3; Troncone bodycam at 23:00:48. As he stood on the passenger side of his car, Turner saw Troncone drive past and then went and sat "down on the front step" in front of his friend's apartment building, just enjoying the evening. Doc. 7 at 4; Troncone bodycam at 28:58:00.

Troncone approached Turner and told him that he could not park in the road. Troncone bodycam at 22:58:01. Troncone proceeded to procure information regarding Turner's identification, vehicle registration, and matters related to the parked car. *Id.* at 22:58:01-59:38. Turner stated his friend had not informed him of the no-parking zone and used his cellphone to call his friend to come to the car, stating he did not have the keys to the car. *Id.* Sergeant Lucas then arrived, Troncone

---

[2] This section is taken primarily from the 'Summary Judgment Facts' set out by the magistrate judge in his report and recommendation, virtually all which derive from Defendants' body camera video and audio recording of the events, which the parties did not contest.

briefly described the situation to Lucas, and then told Turner that he would have his car towed if Turner did not give him the keys. *Id.* at 22:59:39.

As Lucas walked to the driver's side of Turner's car, Troncone asked if Turner's friend was bringing the keys. *Id.* at 23:00:16-22. Turner replied that the "keys were in the car." *Id.* at 23:00:22. When Lucas asked if the car was locked and opened the driver's door slightly, prompting Turner to hold his hands up, saying "hold on," and asking what Lucas was searching for since nothing was in the car. Lucas bodycam at 23:00:16-30; Troncone bodycam 23:00:31. Lucas replied he was not searching the car and only checking to see if keys were in it, and Turner said okay. Lucas bodycam at 23:00:33. Lucas testifies that when he opened the door, he saw "a plastic baggie of what appeared to be crack cocaine in open view in a compartment in the driver's side door," doc. 22-2 at 3, although Turner attests this was factually impossible due to the car's design.

Per his bodycam video, Lucas opened the car door and shined his flashlight on some keys sitting in the driver's seat. Lucas bodycam at 23:00:45-59. He picked up the keys, looked at them, and returned them to the seat. *Id.* He also looked in an open area of the console and pulled out a key fob. *Id.* Lucas attests without dispute that the key fob was the "one set of keys" he found for the car. Doc. 22-2 at 4.

As Lucas looked in the car, Turner complained about the search. Lucas bodycam at 23:00:59. Lucas showed Turner the key fob he had located, repeated he

4

was not searching, and stated in a mildly irritated tone that he would just have the car impounded because it was parked illegally. *Id.* at 23:00:59-23:01:18. As Lucas walked back toward him, Turner spontaneously stated he was on parole after serving a 36 year sentence for burglary and was not trying to do anything. *Id.* at 23:01:17-37. Lucas politely informed Turner that the apartment complex had designated parking spaces and that it was illegal to park in the roadway. *Id.* at 23:01:41. Lucas asked Turner if there was illegal contraband in the car and Turner said no. *Id.* at 23:01:59. Lucas then asked if he could search the car and Turner said "No, but what you want to search it for. I don't care if you want to look in it. I don't care. . .but search me for what?" *Id.* at 23:02:03-17. Lucas responded, "Cos I asked." *Id.*

Turner expressed frustration with his friend, and had a discussion with Lucas regarding his release from prison, current job, and unsupervised parole. *Id.* at 23:02:20-59. Lucas stated that he had only looked in the car for the keys. *Id.* at 23:02:57 to 23:03:17. Turner stated that he was not trying to be an "ass," to which Lucas responded that he was being one "a little bit," but that was "alright" and Turner was not as bad as others he had encountered before. *Id.* at 23:03:18-23. The two then talked about the prison facilities where Turner had served his sentence and Turner commented on his pending divorce. *Id.* at 23:03:24-44.

Turner admitted he had drove and called his friend to come outside. *Id.* at 23:03:45-51. Lucas asked Turner a second time if he could search the car, to which

Turner shrugged and said, "you can man." *Id.* at 23:04:33-35. Lucas walked back to the car, found cocaine in the bag in the driver's seat door compartment, and placed Turner under arrest. *Id*. at 23:04:49-57. Turner spontaneously admitted to possession of the cocaine. *Id.* at 23:05:12. Lucas told Turner he had seen it earlier but was waiting for Turner to tell the truth. *Id.* at 23:05:15.

Lucas's further search of the vehicle produced a pistol from the center console. *Id.* at 23:06:00.[3] Turner initially stated the weapon belonged to his friend, *id.* at 23:06:16-18, but when his friend appeared, Turner admitted to Troncone that the gun belonged to him. Troncone bodycam at 23:16:17. He also told Troncone that his friend would never claim or admit the gun really belonged to the friend. *Id.* at 23:16:31. Troncone transported Turner to the Huntsville City Jail. *Id.* at 23:17-23:40. During this time, Turner never complained about the tightness of his handcuffs. *Id*.

### III. Discussion

**A. Turner's Motion for Leave to Conduct Additional Discovery**

The magistrate judge's Order for Special Report specifically instructed Turner that he must file a motion for leave to conduct discovery no later than thirty (30)

---

[3] Turner filed a reply and an unsworn affidavit to the motion for summary judgment. Docs. 26 & 27. The court cannot consider any unsworn facts contained in the affidavit. That said, the court has examined an allegation in the reply wherein Turner declares that Lucas walked around to the back of Turner's car, squatted down by the passenger door, covered up his body camera, and told Turner that the "[P]laintiff is wrong that he can do what he wants to do." Doc. 26 at 5. After review of footage from the body cameras and the entire events of the evening, the court finds there is no evidence to support Turner's allegation that Lucas covered up his body camera or made the alleged statement.

days after the certificate of service on the Defendants' initial disclosures. Doc. 11 at 5-6. The order also instructed Turner that his motion must describe the nature of the discovery he seeks and explain why the materials provided by the Defendants were inadequate. *Id.* at 6. Turner failed to comply with this order – in particular, Turner waited almost six months after the Defendants filed their initial disclosures – the Special Report, doc. 22, to file his Motion for Leave to Conduct Additional Discovery, doc. 30. Therefore, the motion is untimely. Alternatively, Turner's request to discover Troncone's bodycam video and the "police cars' camera footage" is due to be denied because the Special Report included the bodycam videos of both Defendants, and Turner has failed to explain why those videos are inadequate to provide the information he seeks.

## B. The Defendants' Objections

### 1. *Younger* Abstention

The Defendants state the magistrate judge set forth different conclusions in the report regarding whether this court should stay or dismiss the Fourth Amendment claims for injunctive and declaratory relief. Doc. 31 at 1-2. However, because this court has dismissed all claims for which Turner requested injunctive relief, *see* doc. 10,[4] the issue of injunctive relief is no longer before the court.

---

[4] Contrary to the report and recommendation, doc. 29 at 11-12, Turner never requested return of his property or an order declaring any contraband inadmissible. Instead, Turner attempted to plead a Fourteenth Amendment Equal Protection claim alleging Defendants engaged in the unlawful

7

The Order for Special Report describes Turner's claim: "The [P]laintiff sues Troncone and Lucas in their individual capacities for monetary damages, claiming they conducted an unlawful search and unlawful arrest in violation of the Fourth Amendment." Doc. 11 at 3. In their motion for summary judgment, the Defendants argued that because Turner's ongoing state criminal proceeding involved the same factual basis as his civil complaint, *Younger v. Harris*, 401 U.S. 37, 43-45 (1971) and its progeny require this court to abstain from considering Turner's claims for monetary damages, and to dismiss this action. Doc. 22 at 26-27, 30 (citing *Doby v. Strength*, 758 F.2d 1405, 1405-1406 (11th Cir. 1985); *Gibson v. Berryhill*, 411 U.S. 564, 577 (1973)). The Defendants next argued the undisputed evidence shows they did not violate Turner's Fourth Amendment constitutional rights and concluded by claiming that "[i]n any event, they are entitled to qualified immunity." *Id.* at 30-52.

In their objections to the Report and Recommendation, the Defendants abandon their demand for dismissal on *Younger* abstention grounds, and contend instead that the material question is whether they are entitled to qualified immunity in connection with Turner's claims for monetary damages. *Id.* at 3-23 (citing *e.g.*, *Stoddard v. Florida Bd. of Bar Examiners*, 509 F. Supp. 2d 1117 (N.D. Fla. 2006),

---

practice of racial profiling and harassment. Doc. 1 at 5; Doc. 7 at 2. Turner's only request for injunctive relief pertained to that claim, doc. 7 at 5 ("I want these officers brought to justice and given better training, so that people of color won't be harassed, arrested under false pretenses."), which the court has dismissed for failure to state a claim upon which relief can be granted, doc. 10.

*aff'd*, 229 F. App'x 911 (11th Cir. 2007) (dismissing injunctive relief claims on *Younger* abstention grounds, but refusing to stay monetary relief claims based the Eleventh Amendment and qualified immunity). Therefore, the court turns next to the qualified immunity defense. *Id.* at 24-48.

### 2. Qualified Immunity

Qualified immunity fully protects government officials sued in their individual capacities so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (citation and quotation marks omitted). This immunity insulates government officials carrying out their discretionary duties against "the fear of personal liability or harassing litigation," shielding from suit "all but the plainly incompetent or [those] knowingly violating the federal law." *Lee v. Ferrero,* 284 F.3d 1188, 1194 (11th Cir. 2002).

To successfully assert a qualified immunity defense, "[a] defendant . . . must first show that []he was engaged in a 'discretionary function' when []he performed the complained-of act." *Valentine v. Robinson*, 601 F. App'x 778, 781 (11th Cir. 2015) (citation and quotation marks omitted). A function is discretionary when "but for the alleged constitutional infirmity, [it] would have fallen with[in] [the officer's] legitimate job description" and it is performed in the "authorized manner." *Id.* A discretionary function analysis demands viewing the "general nature of the

9

defendant's action, temporarily putting aside the fact that it may have been committed for an unconstitutional purpose, in an unconstitutional manner, to an unconstitutional extent, or under constitutionally inappropriate circumstances." *Holloman v. Harland,* 370 F.3d 1252, 1263–64 (11th Cir. 2004). Viewed generally, arresting a suspect and searching his vehicle is clearly a part of the Defendants' powers and responsibilities as police officers, and nothing in the record suggests the manner of their search and arrest exceeded their authorization. Therefore, the record supports the Defendants' contention that they were engaging in a discretionary function during their arrest of Turner and search of his vehicle. Thus, the burden shifts to Turner to show "that the facts alleged make out a violation of a constitutional right and that the constitutional right was clearly established at the time of [the] conduct." *Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016). Turner has failed to make this showing.

      a.      **Unlawful Arrest**

Turner alleges his arrest was an unconstitutional seizure because it resulted from an unreasonable search of his vehicle and involved excessive force via the tightness of his handcuffs. Doc. 7 at 5. The Fourth Amendment protects against unreasonable seizures, *Manuel v. City of Joliet, Ill.*, ___ U.S. ___, 137 S. Ct. 911, 917 (2017), with "reasonable" seizures generally requiring either a warrant or "probable cause to believe that the individual has committed a crime." *Id.* (citation

and quotation marks omitted). When a warrantless arrest *lacks* probable cause, the constitutional violation gives rise to a § 1983 claim for false arrest, but the presence of probable cause "constitutes an absolute bar" to such an action. *Case v. Eslinger*, 555 F.3d 1317, 1326-1327 (11th Cir. 2009) (citation and quotation marks omitted).

An officer has probable cause to arrest an individual when, based on the information available and the reliability of the source, a "prudent person" would believe "the suspect has committed, is committing, or is about to commit an offense." *Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003) (citation and quotation marks omitted). Probable cause does not require actual criminal activity, but only the "probability or substantial chance" of such activity. *Case*, 555 F.3d at 1327 (citation and quotation marks omitted). Even "seemingly innocent activity" can be the basis for probable cause. *Id.* Arrests survive the Fourth Amendment bar on unreasonable seizures so long as the arresting officer "has probable cause to believe that an individual has committed even a very minor criminal offense in his presence." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). Finally, the minor offense giving rise to the officer's ability to lawfully arrest the suspect need not be the officer's "subjective reason for making [the] arrest." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citations and quotation marks omitted).

Parking a vehicle "[a]t any place where official signs prohibit stopping" is a misdemeanor traffic violation in Alabama. Ala. Code § 32-5A-137(a)(1)(i). Here,

Turner admits he parked his car in a no-parking zone on the night in question, doc. 27 at 1, and he does not deny that Defendants observed this conduct. Consequently, because Defendants witnessed the misdemeanor parking violation, they had probable cause to arrest Turner, *Atwater*, 532 U.S. at 354, even if they did not invoke the parking offense to justify the arrest, *Devenpeck*, 543 U.S. at 153. As such, Turner has not created a genuine issue of disputed fact regarding his Fourth Amendment unlawful arrest claim.

The excessive force claim, which was subsumed in Turner's unlawful arrest claim, suffers the same fate. Painful handcuffing does not constitute excessive force "where the resulting injuries are minimal," *Rodriguez v. Farrell,* 280 F.3d 1341, 1351 (11th Cir. 2002), and Turner offers no evidence to indicate his handcuffs were too tight, to show he complained of discomfort, or to identify even minor injuries resulting from his handcuffing. Based on this record, Turner fails to create a genuine issue of disputed fact concerning his excessive force claim.

    **b.**     **Unreasonable Search of Vehicle**

A search conducted without a warrant issued upon probable cause is "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (citation and quotation marks omitted). The Defendants posit two exceptions apply to their warrantless search: inevitable discovery and consent. Doc. 22 at 36-

47. Because the consent exception is sufficient to render a decision on summary judgment, the court does not address the Defendants' alternative arguments.

When an individual gives police officers consent to search his property, this consent renders a warrantless search lawful. *See Texas v. Brown*, 460 U.S. 730, 735-36 (1983); *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). But when that consent follows an illegal search or other unlawful police activity, the court must evaluate the constitutionality of the later consent. *United States v. Delancy,* 502 F.3d 1297, 1308 (11th Cir. 2007) (citation omitted). The court first assesses the voluntariness of the consent and then considers whether the consent was the product of "an illegal entry" by the police. *Id.* (citation and quotation marks omitted).

Turner's claim that Defendants engaged in an unreasonable search is limited to Lucas's initial attempt to search for the keys, during which Lucas slightly opened the car door after asking whether it was unlocked. Lucas bodycam at 23:00:16-30; Troncone bodycam 23:00:31. Turner denies he gave Lucas permission to conduct the search of his vehicle for the car keys. Doc. 27 at 1-2. But the undisputed evidence establishes Turner subsequently consented to Lucas's search of his vehicle after the allegedly illegal initial search. Turner neither addresses nor disputes that he twice consented to the search of his car after the initial attempt to search for the keys. *Id.*

### i. Voluntariness

An individual's consent to search survives Fourth Amendment scrutiny "if it is voluntary; if it is the product of an essentially free and unconstrained choice." *United States v. Spivey*, 861 F.3d 1207, 1213 (11th Cir. 2017) (citations and quotation marks omitted). Voluntariness inquiries require "case-by-case analysis" based on "the totality of circumstance." *Id*. Factors relevant to the analysis include "the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found." *Id*. The Defendants bear the burden of establishing the Turner's consent was "freely and voluntarily given." *Id.*

The undisputed facts indicate Turner gave free and voluntary consent for Lucas to search his vehicle. Turner does not dispute the Defendants' contentions, doc. 1 at 42, that: 1) he was not in custody at the time he consented to the search, 2) the Defendants had not drawn their weapons or blocked Turner's vehicle with their patrol cars, 3) Turner cooperated by answering the Defendants' questions, and 4) the Defendants addressed Turner in a normal, conversational tone of voice. Though Lucas remarked in an irritated tone that he would just impound the car, *id.* at 23:00:59-23:01:18, and told Turner he was being "a little bit [of an ass]" by not

14

consenting to the search, *id.* at 23:03:18-23, these actions fall short of being coercive.[5] Nor do Lucas's multiple requests for consent suggest coercion. Persistence may lead to involuntary consent if the officers make so many requests that the plaintiff consents in order to "escape further harassment or as a result of frustration and exhaustion," but a few requests, as was the case here, do not constitute coercion. *United States v. Garcia*, 890 F.2d 355, 361-62 (11th Cir. 1989) (finding officers' request for unconditional consent to search after receiving qualified consent was not coercive and therefore did not invalidate plaintiff's consent).

To close, because "an officer conducting a routine traffic stop may request consent to search the vehicle," *United States v. Purcell*, 236 F.3d 1274, 1281

---

[5] *See United States v. Danner*, 720 F. App'x 529, 530 (11th Cir. 2017) (no coercion because the individual was not handcuffed, officers did not draw their weapons, and they did not yell or threaten her); *Delancy*, 502 F.3d at 1308 (no coercion because the plaintiff was not threatened with violence or removal of her children); *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) (no coercion because police neither yelled nor threatened violence, and the "encounter [was] quite low-key and professional"); *Hudson v. Hall*, 231 F.3d 1289, 1296 (11th Cir. 2000) (finding the consent was voluntary because officers did not threaten force or verbally abuse the plaintiff). Furthermore, none of the factors that this Circuit has identified as circumstances suggesting police coercion that might render consent involuntary are present in this case—e.g., an officer blocking or otherwise impairing the individual's progress, *United States v. Bowles,* 625 F.2d 526 (5th Cir.1980); an officer retaining an individual's tickets or identification; *United States v. Chemaly,* 741 F.2d 1346, 1352 (11th Cir. 1984); *United States v. Robinson,* 690 F.2d 869, 876 (11th Cir. 1982); an officer physically maneuvering the individual in a particular direction, *United States v. Berry,* 670 F.2d 583, 604 (11th Cir. 1982); an officer asking questions or making statements that would lead a reasonable individual to believe that he or she had been singled out as suspicious, *United States v. Chemaly,* 741 F.2d at 1353; *United States v. Elsoffer,* 671 F.2d 1294, 1298 (11th Cir. 1982); *United States v. Berry,* 670 F.2d at 597; or an officer informing the individual that an innocent person would cooperate with the police, *United States v. Setzer,* 654 F.2d 354, 357–58 (5th Cir. Unit B 1981), *cert. denied,* 459 U.S. 1041, 103 S.Ct. 457, 74 L.Ed.2d 609 (1982).

(11th Cir. 2001), Lucas was within the scope of proper official conduct to ask Turner's permission to search the car. And because the interaction was conversational, and any pressure Lucas exerted on Turner to consent to a search was mild,[6] the court finds that Turner freely consented to the search.

### ii. Fruit of the Poisonous Tree

Even if consent following illegal policy activity is voluntary, this voluntariness alone cannot remove the taint of the illegal activity. *Delancy*, 502 F.3d at 1308. Courts will exclude evidence found during the consented-to search if the evidence is the "fruit of the poisonous tree." *Id.* (citation and quotation marks omitted). This second requirement concerns causation: the evidence under objection must be found "by means sufficiently distinguishable" from the illegal activity in order to be "purged of the primary taint." *Id.* (citation and quotation marks omitted).

Whether an initial illegal search tainted voluntary consent depends on "whether the consent was sufficiently an act of free will to purge the taint of the unlawful invasion" or whether the connection between the illegal activity and the consent was "so attenuated as to dissipate the taint." *Id.* (citation and quotation marks omitted). While no single fact is dispositive in this fact-specific inquiry, the Eleventh

---

[6] *See United States v. Espinosa-Orlando*, 704 F.2d 507, 513 (11th Cir. 1983) (holding a defendant's consent was voluntary even though he had been arrested at gunpoint and was lying face-down on the payment at the time of consent); *see also United States v. Long*, 866 F.2d 402, 405 (11th Cir.1989) (finding officers' statements they could return to the plaintiff's home and "dig up the place" did not rise to the level of coercion necessary to invalidate consent).

Circuit uses three factors to evaluate the taint: "the temporal proximity of the seizure and the consent, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *United States v. Scott*, 517 F. App'x 647, 650 (11th Cir. 2013) (citation and quotation marks omitted). The court evaluates not only "whether [Turner's] will was overborne by" Lucas's initial illegal search, "but also whether his consent was a 'product' of that illegality." *Id.* (quoting *United States v. Santa*, 236 F.3d 662, 677 (11th Cir. 2000)).

A review of these factors shows that Turner's consent was not tainted by Lucas's initial illegal search of his vehicle. To begin, the time between the initial search was short and no intervening circumstances interrupted the two events. Generally, a short time lapse between illegal activity and consent indicates taint, *Delancy*, 502 F.3d at 1310, but "the *character* of the interaction between the law enforcement agents and the defendant" determines how heavily the time lapse weighs on the determination. *United States v. Smith*, 688 F.3d 730, 739 (11th Cir. 2012) (emphasis in original) (citations and quotation marks omitted). Approximately two minutes passed between Lucas's initial search for Turner's keys and the first time he asked Turner for consent to search the vehicle. Lucas bodycam at 23:00:16-30; *Id.* at 23:02:03-17. Lucas again requested permission two minutes later, and Turner gave consent to search. *Id.* at 23:04:33-35. While the four minutes that elapsed between the initial search and Turner's consent was extremely short, the

17

conversational character of the interaction limits the strength of the temporal factor in excluding evidence of the later search. And, from the video, Turner was not handcuffed or otherwise blocked from leaving the interaction, and both Defendants maintained a conversational tone and never threatened Turner. Therefore, because the Defendants' behavior was "relatively unintrusive," *Smith*, 688 F.3d at 740, the court finds that the close temporal proximity in this case is not the most important factor in determining attenuation of the tainted search.

As to the second factor, unlike *Delancy*, Turner did not issue written consent demonstrating his understanding of his constitutional rights to refuse the search. *See Delancy*, 502 F.3d at 1311-12. However, Turner's consent was still "sufficiently independent," *id*. at 1312, of the illegal activity because he protested to a search twice while Lucas looked for the keys, Lucas bodycam at 23:00:16-59. These protestations indicate Turner knew he could decline the requests to search his vehicle.

Despite the short time lapse and lack of intervening circumstances between the initial search and the consent, the lawful purpose and mild nature of the initial illegal search for the keys weighs heavily against finding Turner's consent was tainted. If the Defendants had engaged in the initial search with "the purpose of obtaining consent to conduct a full-scale search," *Delancy*, 502 F.3d at 1312, Turner's subsequent consent would be tainted. But Lucas had a lawful purpose in

looking in the car during the initial illegal search: he was actively trying to move Turner's illegally parked car. Moreover, Turner gave conflicting information concerning the location of his car keys, presenting the Defendants with a question of whether the vehicle could be moved without towing. And, during the illegal initial search of the vehicle, Lucas examined the areas surrounding the driver's seat, confining his search to possible locations of Turner's car keys. Lucas bodycam 23:00:31-23:01:13. In fact, Lucas's actions during the initial illegal search do not indicate "flagrant disregard of [Turner]'s rights." *Delancy*, 502 F.3d at 1313. He did not restrain or threaten Turner, and he kept his search within the scope of looking for the car keys. Lucas bodycam at 23:00:45-59; doc. 22-2 at 4. Finally, Lucas also refrained from exploiting the drugs he found in plain view during his initial search. *See United States v. Yarbrough*, 281 F. Supp. 3d 1225, 1240 (N.D. Ala. 2018) (finding the officer's misconduct flagrant because they "placed the illegally seized shotguns in [the plaintiffs'] plain sight while he was pursuing their consent to search . . ."). Lucas did not confront Turner with the discovery or otherwise indicate that he had made such a discovery, waiting instead until after Turner freely consented to the search. Lucas bodycam at 23:05:15.

To close, in light of Turner's voluntary and untainted consent to perform a subsequent search that yielded cocaine, Turner has failed establish a genuine issue of material fact as to his Fourth Amendment unlawful seizure claim. Accordingly,

the Defendants' motion for summary judgment is due to be granted. The court will issue a separate order dismissing the case.

**DONE** the 16th day of September, 2019.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE